Thank you, Your Honors. Good morning. May it please the Court, my name is Debra Smith. I represent the petitioner Patrick Favi. I'd like to reserve two minutes for rebuttal. At the beginning, I'd like to acknowledge the Favi family's appreciation of the Court and this panel in particular's attention, continuing attention to this case. The matter is before the Court a second time now, and matters concerning whether Mr. Favi is entitled to relief from removal are really no better identified for the Court than they were almost two-and-a-half years ago when we first were here. Mr. Favi has three claims for relief, asylum and withholding of removal, and convention against torture. When we were here before, the Court's opinion, unpublished opinion, acknowledged that in the immigration judge's decision, there was a tacit finding of persecution, and there was some ambiguity with regard to whether the Board believed that there was a particular social group. So the Court, with the express instruction to address the particular social group claim, remanded the case. The Board's decision, again, affirmed the immigration judge's order of removal and found that there was no particular social group for the reason that there was lack of objective evidence to support the existence of the group, and that the only existence of the torture practice or that the harm practiced by the group was from a tribe, and there was no information about the existence of the tribe or the family or whether they really practiced. Counsel, part of the problem I have with the theory of a social group here is that it seemed like he was alleging that he would get discipline from his father, not from other members of the tribe. So how can, like, discipline from a parent be transformed into persecution from a social group? Family can be a social group, Your Honor. Sanchez-Trujillo, which is cited by the government at all levels, I think, of this case, says that a family can be a – is a prototypical. If a particular family was being persecuted, but if the persecution is from the person's father, is there any – do you have any precedent that suggests that fear of corporal punishment from a particular parent is fear of persecution from – on – because of your social group? Your Honor, I believe – I mean, wouldn't that mean in every case where a parent was abusive that a – that a claimant could say they're being persecuted on account of their membership in their nuclear family, to me, doesn't meet the concept of asylum? That it might be too broad, Your Honor, I think is what you're – you're suggesting or inquiring about. I think – I'm only inquiring if you have any precedent that would support that theory. And I'm expressing my concern about it. Well, I think matter of Kassinja and the court's cases, Mohammed, for example, where female genital cutting is a family-based decision in the broader context of a – of a clan, stands for the proposition that in some cases, a practice that is practiced – a practice that is observed by a family can constitute persecution and in some cases torture. I don't think the court needs to go to the proposition, and we're not suggesting that in every case punishment by a family could be persecution or torture. Do you have any evidence in the record that this is a practice of the tribe? Your Honor, the – the evidence is the testimony of the applicant and his mother. It is supported by general evidence from the country condition report. But there's nothing in the country condition report that says that there is torture condoned in families of the tribe. That is correct. The country condition report talks about general cases of mob injustice, of lawless That's where I think there seems to be a disconnect here. He defines the social group as fathers of – of sons of fathers of the Oregon tribe, correct? Well – I mean, that's what the brief seems to say. Well, the – I should just ask you to – to illuminate for us, just so we're not unclear. What is the defined social group? And then once we have an answer to that, I have some additional questions. In my reply brief on page 7, I indicate that his social group is that of members within the Ogun tribe who use torturous punishment on family members who are perceived to bring shame upon the family. The Court talked about sons of fathers in its previous decision. The Board has used different formulations of the group. But this description here in my reply brief is the same as – and I was the attorney that wrote the asylum application. It has generally been the same. But go back, then, to the question is that with respect to the tribe itself and punishment, it seemed that the only evidence was what the BIA pointed to, which had to do with the sister-in-law and this same individual. So again, we're back to an abusive individual rather than a tribal clan or other group. How do you square that evidence with your theory? Well, Your Honor, I think that, you know, similarly to the case of female genital cutting, I mean, you're talking about an abusive individual and a tribe – Well, we know in the case of the genital mutilation that this is a cultural thing within large groups of people in Africa. And we don't have anything in this record that tells us that this is the practice of this tribe broadly practiced. No. And, Your Honor, you're raising, you know, one of the difficult issues for Mr. Favi in this case. I acknowledge that. But – Maybe you should turn to the Katt claim and tell us whether the government has any knowledge of or acquiescence in the kind of conduct that Dr. Favi suggests he might impose on his son. Your Honor, the indication of acquiescence by the government is, again, relied – relies exclusively on the testimony from Mr. Favi and his mother, that they – that Mr. Favi and his mother will, prior to the beating and after the beating, attempt to seek protection from the authorities for the beating or any continued beating. Mr. Favi's – so in that sense, there's acquiescence. To the extent that Mr. Favi is actually put in a jail or hospitalized in a mental institution, that has the clear involvement of the government in it. But we don't have any testimony that really says the government would acquiesce, condone, or participate in that kind of treatment. Well, again, it gets back to the issue of the only testimony – the only evidence supporting Mr. Favi's claim is his and his mother's credible testimony. And under this Court's precedent, the credible testimony of the applicants alone is sufficient. Well, it is if it's on something which is personal to their knowledge. But do they know how the government would react? They have a fear, Your Honor. Are they testify about – Mr. Favi testified, I believe, about people that had been – had escaped from a mental institution in his hometown, some twins, and how they were persecuted. The asylum application, which was taken under oath by the judge, talks about the conditions in the jails. That's the testimony there is, the evidence there is. All right. To preserve the rest of our time. Could we begin backwards, if you will, with the Catt claim? And let me ask about that. When we remanded last time, we had a specific question we wanted the BIA to deal with, and it's now dealt with that question. Are we back in the posture where we simply look at the IJ findings that the BIA adopted on Catt and determine whether they meet the standard? Yes. Yes, Your Honor. I believe so. The immigration judge's original decision denying the Petitioner's request for protection under the Convention against Torture is what the Court is reviewing here. That decision was affirmed without opinion by the – or the Board affirmed it the first time by simply affirming the specific page number that it was on. But, yes, it's that decision by the immigration judge that we are – should be reviewing here. That decision was that the Petitioner had failed to establish that the threatened harm would be undertaken with the consent or acquiescence of the government, and there is substantial evidence, certainly, to support that determination. Counsel, I might have this wrong, so please correct me if it's wrong, but as I recall, the IJ said that there was no indication that if there was traditional discipline – I assume that means punishment by the father, like corporal punishment – that the government would acquiesce in that or be part of it. But did the IJ address the contention that the Petitioner would be put in a mental hospital or jail and that there's a cat claim with regard to the incarceration or with regard to the hospitalization? The immigration judge essentially dismissed the plausibility of that idea in the Petitioner's claim, that it was simply implausible that the Petitioner's father would have him committed to a mental institution for this drug use. But the – It didn't actually deal with how the government would be involved or react. Is that right? That's correct, yes. Yes. So, I mean, on that, there's kind of different parts to his, I guess, asylum and cat claim. One is just the abuse by the father. The other is that he would put him in this mental institution. On that point, I think the IJ said that she saw that – the IJ saw that as far-fetched to the court, and then there is some speculation about why the father would or wouldn't do something. I guess the question I have is, is there an IJ finding that there's no government action, or is the IJ finding that the claim is not credible? I think it's unclear. I'm not sure which page it is that I'm citing here. I think it might be page 27 or something like that of the IJ decision. It's right at the end. It's 121 in the transcript. It's right at the end of that. Yeah. It's on page 121 of the transcript, and then there's some at the end as well. The paragraph starts, as for the torture that the Respondent fears. Yes. That's the last page. That was the only part of the portion of the immigration judge's decision that was actually affirmed by the Board or the torture claim that was affirmed by the Board. I think that deals specifically with this threat of the threat of fear from his father in terms of beating. Right. So here's the question that I have. I hate to even bring this up, but since we've already been back once, but it did seem like that he had several aspects to his cat claim, and the one that got addressed was the father's beating and not the claim that there would be this government complicity and he'd end up in a mental institution. Is that as a part of his cat claim that needs to go back because we don't have a determination on it? I don't think the ---- I think the remand, I don't know that remand would be required if the Petitioner had not raised that issue previously. I don't think the Petitioner ever claimed that the Board missed something with the ---- I kind of hesitate to say that with any definitivity because I haven't specifically looked at the record for this, but I don't believe that the Petitioner ever complained about the Board having missed some portion of the cat claim. Are the I.J. having missed a portion? I'm sorry. Yes. Yes. The I.J. having missed a portion. Well, the I.J. addressed the idea of him being hospitalized and said it was far-fetched. Yes. Assuming for sake of argument that we were to conclude that it was not far-fetched or that the I.J.'s statement in that regard was speculative, then would the claim have to go back to the BIA to assess whether there would be government encouragement or acquiescence in hospitalization? I would like to think you could take the decision on page 20. The discussion of non-consent or acquiescence as to the beating by the father put way on that issue of hospitalization. There's no indication in the record that the hospital or the psychiatric would be a potential commitment to a psychiatric institution would be a government institution. So I don't think it's very specific in the record, but I believe you could sort of imply that from the back end. And I also would be you know, it's kind of like when we imply things, we usually get in trouble like in Ventura. You tell us to quit implying things. So I'm just wondering whether, you know, just because of the way this went back on one issue, the question is whether the, you know, whether the I.J. really did address directly the government involvement in the mental institution claim. And then also there was a subsidiary claim, which I think is separate, and that is that the police would be involved in the beatings, separate from the father. Do you think that's dealt with in the portion of the record you pointed to at the top page at the end of the? Yes, Your Honor. I do think it's very fair to imply from that portion of the decision that it is a discussion of government involvement with regards to the father's beating. I don't think there's any allegation that the government itself would be involved in the beatings. It's this idea that the government would believe the father versus the decision of the petitioner. And so I do think that the portion of the I.J.'s decision here is relevant to that issue. Again, I would sort of encourage the Court to use his waiver and exhaustion because I don't believe that the any flaws in the I.J. or the Board's decision as to the issues the Court is now addressing were raised in the Petitioner's brief. So I don't want to state that with, in a definitive way, but I believe it is the case. We'll obviously go back and check that. I think the the You would be referring to the Petitioner's brief to the BIA? Yeah. Well, I mean, the question of exhaustion would, I believe, require consideration of each of the Petitioner's briefs to the Board, not just its first brief to the BIA. I would like to touch briefly on the social group claim, unless there are other questions on the Convention Against Torture issue. The Board's decision in this case was specifically that the Petitioner failed to establish the existence of the social group, and because it had to establish the existence of the social group, therefore, could not imply the prosecution on account of membership in that group. And I think the Court has identified that the evidence in the record does not support or much less compel the conclusion that this Ogun tribe engages in a torturous form of punishment. The record simply doesn't establish that fact. And because the nonexistence of the social group is certainly an independently sufficient basis to deny the Petitioner's requests for asylum and protection of the asylum and withholding removal, the Board's decision on that issue is supported by substantial evidence and certainly should be confirmed. Unless there are further questions, I would submit on those comments. Thank you, Your Honor. We took a little extra time with the government, so we'll give you a minute and a half for rebuttal. Thank you, Your Honor. Concerning the issue about whether the immigration judge dismissed the cap claim concerning Mr. Favi's fear of going to a mental hospital or a jail, those to the extent the immigration judge addressed those, his treatment of those issues were just based on impermissible conjecture. What he thought Dr. Favi would do, it's clear from reading the hearing transcript where he made those statements, and then he memorialized his hearing statements in the written opinion or the oral decision where he indicated that it would not be in Dr. Favi's interest. What about when he says, though, that the whole story is far-fetched? Isn't that a discounting of the option? It's not based on adverse credibility determination, but based on what the immigration judge believes that Dr. Favi would or wouldn't do. The underpinnings of that conclusion were that it would bring why would Dr. Favi want to suffer the embarrassment of jailing his son or putting him in a mental institution? So I think the Court's precedent, this Court's precedent, is clear that that kind of conjecture can't support an adverse credibility determination. I just want to say on the concept of exhaustion, it's being mentioned for the first time here, and I can appreciate that many different attorneys from the Department of Justice have worked on this case, but I have raised that issue in every single brief that I have filed in this Court and before the Board, this issue being the Convention Against Torture Claim Concerning Mental Institution and Jails, including it's on page 11 of the record. I have a question for you. I think I understand the issue about putting him in a mental institution and the cat theory on that. I didn't quite understand the idea on the claim that he would be jailed, because I thought the only testimony, at least that I saw on that, was if he commits a crime, he's going to be jailed. Like, you know, if he did illegal drugs in Benin, he's probably going to go to jail. I thought that there was lots of precedent that would say arresting someone or jailing them for a crime would not be persecution in itself, that you couldn't view that as Mr. Favi's jail claim was broader than just if he commits future drug crimes, he will be jailed. There was a claim, and I cite to the record, that if he resists the beating, tries to resist, calls the police, that Dr. Favi would cook up some claim, perhaps, and tell him, oh, he's, he's, he's, you know, doing drugs or, and he has done drugs, you know, he could put him in jail, put him in a mental institution. It's all mixed together. Testimony isn't precise. Did the I.J. address that jailing theory? He addressed it. You'll find more statements about it in the hearing transcript and in the pages that I cite. But in the oral decision, I'm not sure he addressed jail in the oral decision. I can't remember. I'm sorry, Your Honor. But I know in the hearing he did. He said, why would Dr. Favi do this? It would bring him embarrassment. Let me ask one further question. I know we've exceeded everybody's time, but there's some evidence in the record that Dr. Favi would do nothing to harm his son if he didn't persist in using drugs when he's sent back. I think the that's The I.J. could find that that was substantial evidence that there's no proof that anything's going to happen to him. Your Honor, and that's the government's position in the torture brief, that it pertains to future actions by Dr. — by Mr. Favi. And I don't think that's what the testimony says, and I don't think that's what the asylum application says. The asylum application and the testimony talk about punishment for past acts. The testimony is — is imprecise. I don't think — I guess the most generous interpretation for the government would be that the testimony is imprecise. And where ambiguity should be resolved in favor of the alien trying to fight deportation from this country. Thank you. Thank you. The case just argued, Favi v. Gonzalez, is submitted. Thank both counsel for your arguments this morning.
judges: B. Fletcher, McKeown, Gould